EASTERN DISTRICT of KENTUCKY
TENDERED
DATE 04-01-15 *Lm*
ROBERT R. CARR
CLERK U S DISTRICT COURT

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION
LEXINGTON

CRIMINAL ACTION NO. 14-74-DCR

UNITED STATES OF AMERICA            PLAINTIFF

V.            <u>PLEA AGREEMENT</u>

ALVIN JASON GIVENS,
aka JIT            DEFENDANT

\* \* \* \* \*

1. Pursuant to Federal Rule of Criminal Procedure 11(c), the Defendant will enter a guilty plea to Count 2 of the Indictment, charging a violation of 21 U.S.C. § 846, conspiracy to distribute 100 grams or more of a mixture or substance containing a detectable amount of heroin.

2. The essential elements of Count 2 are:

> (a) First, that two or more persons formed, reached, or entered into an agreement or understanding to distribute a mixture or substance containing a detectable amount of heroin, a Schedule I controlled substance;
>
> (b) Second, that at some time during the existence or life of the agreement or understanding, the Defendant knew the purpose of the agreement and deliberately joined the agreement or understanding; and
>
> (c) Third, the amount of the heroin involved in the conspiracy was 100 grams or more.

1

3. As to Count 2, the United States could prove the following facts that establish the essential elements of the offense beyond a reasonable doubt, and the Defendant admits these facts:

Beginning in September 2013, and continuing through on or June 12, 2014, in Montgomery County in the Eastern District of Kentucky and elsewhere, Alvin Jason Givens, aka Jit, conspired with Jeffrey S. Wingate and others to distribute 100 grams or more of heroin. During this same time period, Givens also conspired with Wingate and others to distribute Oxycodone 30 milligram pills.

During the course of investigating Wingate's activities, law enforcement learned that Givens was Wingate's source of supply of both Oxycodone pills and heroin. During the investigation, law enforcement learned that Givens had supplied Wingate with approximately two ounces of heroin in February or March 2014.

Law enforcement obtained authorization to conduct wire and electronic interceptions on Wingate's cell phone during May 2014. On May 23, 2014, at 11:50 a.m., law enforcement intercepted a call from Wingate to Givens. During the conversation, Wingate asked Givens, "Remember that first stuff we done with that 'H'?," that is, heroin. Wingate continued, "I think we can do a little something with that going forward." Wingate stated, "We don't need to cap'em up no more and if we can get away from cuttin' we can do that too." Wingate also said, "I have a guy with me now who can get rid of it." Later in the conversation, Wingate asked Givens the price of an ounce. Givens replied the price was $3,600 per ounce for the "good, good stuff," and for "the best out there," the price was $3,700-$4,200 per ounce. Wingate requested Givens look into acquiring 6 to 10 ounces of heroin.

On May 24, 2014, at 5:32 p.m., Wingate called Givens and asked him "What should we ask for a gram?" Givens replied that an appropriate price would be $125-$150. Wingate stated that he "priced a couple at $125," and that "when you do the math on it . . . when you get rid of an ounce it pretty much makes you even but where you made your profit at is where you cut it and sellin' those units, right?" Givens acknowledged affirmatively by stating, "Uh huh."

In late May 2014, law enforcement learned that Wingate traveled to the Miami, Florida, metropolitan area to meet with Givens. On May 29, 2014, at 4:14 p.m., Wingate called Givens and told Givens that he (Wingate) had checked into a Comfort Inn and Suites in Weston, Florida. Wingate and Givens discussed Oxycodone pills and Wingate asked Givens if he "got an accurate count." After much back and forth and discussion of

2

numbers, Wingate and Givens agreed on a number totaling 2,873. At 7:34 p.m., Givens called Wingate and Wingate reminded Givens not to forget "those 30s," meaning the Oxycodone 30 milligram pills.

On May 31, 2014, at 11:32 a.m., Wingate called Givens after Wingate had arrived back to Mt. Sterling, Kentucky, from Florida. During the conversation, Wingate told Givens, "Don't forget the 'H' part because we're going to start doing that too." Givens replied, "Ok then. I'm on that." "H" was a reference to heroin. Givens asked Wingate, "what you want to start out with," and "what you want me to tell him," meaning, what amount of heroin was Givens supposed to acquire from his supplier. Wingate replied, "I don't know. I guess you need to help me there," and that "we're in the start-up phase." Wingate continued, "From the time I was down there until the time I got back they moved 450 caps." Givens replied, "What the fuck!" Law enforcement interpreted this exchange to mean that "they," that is, Wingate's heroin distributors in Mt. Sterling, sold 450 capsules of heroin. Wingate told Givens that he (Wingate), "only left him 500." Wingate explained that "because we had that little thing there," he (Wingate) "blocked it," and it "might have been an ounce or over." Wingate stated "we are going to crush it up, and put it into caps." Givens acknowledged by stating, "I showed you how to do that." Law enforcement interpreted this statement to mean that Wingate had previously acquired heroin and is intending to use this heroin to fill more capsules to offer for sale and that Givens showed Wingate how to fill the capsules with heroin. Wingate continued, "the only thing I had total, the only thing I had was '2 ozs,'" and "I bought two of them." Law enforcement believes that this statement corroborates that Wingate had previously purchased two ounces of heroin from Givens. Wingate answered Givens' inquiry about how much heroin to acquire from the source of supply by stating, "so what I'd do 'Jit,' is talk to him to see where the price takes the turn." Givens replied, "That's what I'll do." Wingate continued, "If we can get this part doing what the other is doing . . . I think that would help the both of us out."

On June 2, 2014, at 7:59 p.m., Wingate received a call from Givens. During the conversation, Wingate and Givens discussed Wingate's next trip to Florida and acquiring Oxycodone pills and heroin. Wingate told Givens, "I'll try to be there by Friday." Wingate asked Givens if he "got all the 'blues' you can get," and "how many is that." Based on the context of the conversation, law enforcement interpreted the reference to "blues" to be Oxycodone pills because some Oxycodone pills are blue in color. Givens replied, "I don't even know. I can count it up." Wingate asked, "Would you care to count it up and shoot me a text." Givens replied, "I know I got 187 and 60," that "Earl has what he has," and another person has "240." [On June 3, 2014, in response to his request for an accurate count, Wingate received a text from Givens that stated "833."]

During the June 2, 2014, conversation, Wingate also asked Givens, "Have you

3

talked to the other guys about the 'H'," meaning the heroin. Givens stated he had, and that "they'll be ready for me this week," with "a couple of ounces." Wingate inquired about the quality and the price. Givens stated that "they said it will be real good." Givens cautioned Wingate that the "game with these new people, when they call you, you got to go," and "you can't be bullshitin' with them." Givens then stated, "he said he'll give me a couple of ounces at 36, between 34-36," and "this gonna be the real shit, for real, for real." Law enforcement believes that this statement meant that Givens could acquire the heroin from his supplier for between $3,400 and $3,600 an ounce and the heroin would be of high quality.

On June 8, 2014, at 2:47 p.m., Wingate called Givens and Wingate made plans to meet with Givens on June 9, 2014, and acquire heroin and Oxycodone pills. During the conversation, Givens stated, "I'm gonna let 'dude' know that you gonna be here and I'm gonna get that from him." Givens continued, "I'll tell him we can get three of them or two of them, or whatever you want to do." Wingate asked, "Is the price the same for two or three, or does it go down if you get three?" Givens responded, "He said he wants 3,400." Wingate confirmed, "3,400, okay." Based on these statements, Givens and Wingate referred to obtaining two to three ounces of heroin for approximately $3,400 per ounce. Wingate asked, "Is it real good, real real good, or like what we had last time?" In response, Givens stated, "What I was going to do was get a little bit of it and take it to Earl . . . and let Earl hit it." Givens continued they would know if it was of good quality, "If Earl say that's it," and that Givens intended to provide a small sample of heroin to "Earl" to test, that is, "hit." Givens also stated, "Anything is better than what we got." Givens continued, "With what you're getting it for, I don't think you should touch it," meaning that Givens felt that Wingate should not attempt to cut or alter the purity level of the heroin. Wingate replied, "I think what we got last time was just alright."

On June 9, 2014, law enforcement intercepted a call between Wingate and Givens. During the call, Wingate told Givens he was in Florida and was approximately three hours from the Miami, Florida, area. Wingate and Givens also discussed the heroin Givens acquired for him. Specifically, Givens stated, "don't cut it," meaning do not dilute the heroin because it had already been diluted. Wingate replied, "Yeah, but if I don't touch it I can't make no money." Givens stated, "You're capping it up, that's how you make your money." Givens instructed Wingate that he should not cut the heroin and put it into "caps," because, "that's how we got that problem the first time." Givens continued, "We deal with a higher power that where you at, you understand?" Law enforcement interpreted this statement to mean that the heroin was a higher purity than what is usually available in central Kentucky. Givens stated, "so if Earl (Given's unknown associate) is saying its good through the vein and it is good through the nose, okay, leave it like it is." Later in the conversation, Wingate stated, "If I take 1 ounce and it cost me 30 something hundred dollars, how many caps I get out of that times 20 . . .

4

will be what my profit will be." Wingate continued, "I got two off of you. At different times. I got one one week and one another week."

On June 9, 2014, at 2:49 p.m., law enforcement intercepted a call between Wingate and Givens in which Wingate told Givens he had arrived and was staying at a Courtyard by Marriott in Weston, Florida. At 2:51 p.m., law enforcement intercepted another call between Wingate and Givens in which Wingate instructed Givens to bring the "833," meaning, the 833 Oxycodone 30 milligram pills, and the "three other things too," meaning the 3 ounces of heroin. Givens agreed to do so. At 3:08 p.m., Wingate sent Givens a text message with his room number at the hotel. Shortly thereafter, FBI surveillance personnel observed a man believed to be Givens arrive at the hotel.

On June 10, 2014, at 10:14 a.m., Wingate received a call from Givens. During the call, Wingate told Givens that he (Wingate) had given him $29,000 for the "blues," meaning that Wingate had paid Givens the money for Oxycodone pills, that is, "the blues." Wingate also stated that he had given Givens $10,200 for the "rock," meaning that this money was for the heroin Wingate acquired from Givens.

On June 12, 2014, Wingate was traffic stopped by law enforcement personnel in Madison County, Kentucky, on his return from Florida. Law enforcement searched Wingate's vehicle and discovered three ounces of heroin, approximately 1,100 Oxycodone pills, and other drug distribution paraphernalia. Law enforcement searched Wingate's residence and discovered an additional 2,500 Oxycodone pills, approximately $200,000 in cash, and several firearms. Wingate was interviewed and he admitted that he received the heroin and Oxycodone pills found in his possession from Givens.

In December 2014, Givens was arrested by law enforcement personnel in the Miami, Florida metropolitan area. A search of Givens' residence upon his arrest resulted in the discovery of firearms.

The amount of heroin attributable to Givens, based on the intercepted calls set forth above and the seizure from Wingate on July 12, 2014, is approximately 5 ounces (140 grams). Givens is also responsible for the distribution of approximately 20,000 Oxycodone 30 milligram pills to Wingate (roughly 2,000 pills per month from September 2013 through June 12, 2014, including the pills recovered at Wingate's residence).

4. The maximum statutory punishment for Count 2 is imprisonment for not less than 5 years and not more than 40 years, a fine of not more than $5,000,000, and a term of supervised release of not less than 4 years. A mandatory special assessment of $100 applies,

5

and the Defendant will pay this assessment to the U.S. District Court Clerk at the time of the entry of the plea.

5. Pursuant to Rule 11(c)(1)(B), the United States and the Defendant recommend the following sentencing guidelines calculations, and they may object to or argue in favor of other calculations. This recommendation does not bind the Court.

    (a) United States Sentencing Guidelines (U.S.S.G.), November 1, 2014, manual, will determine the Defendant's guidelines range.

    (b) Pursuant to U.S.S.G. § 2D1.1(c)(4), the base offense level is 32 based on a marijuana equivalency of 4,160 kilograms for the heroin and Oxycodone pills attributable to the Defendant.

    (c) The United States believes that, pursuant to U.S.S.G. § 2D1.1(b)(1), a 2 level increase applies for the Defendant's possession of firearms. The Defendant reserves the right to argue against this increase.

    (d) Pursuant to U.S.S.G. § 3E1.1 and unless the Defendant commits another crime, obstructs justice, or violates a court order, decrease the offense level by 2 levels for the Defendant's acceptance of responsibility. If the offense level determined prior to this 2-level decrease is level 16 or greater, the United States will move at sentencing to decrease the offense level by 1 additional level based on the Defendant's timely notice of intent to plead guilty.

6. No agreement exists about the Defendant's criminal history category pursuant to U.S.S.G. Chapter 4.

7. The Defendant waives the right to appeal the guilty plea and conviction. The Defendant waives the right to appeal any determination made by the Court at sentencing with the sole exception that the Defendant may appeal any aspect of the sentence if the length of the term of imprisonment exceeds the higher of the advisory sentencing guidelines range as

6

determined by the Court at sentencing or the statutory minimum sentence. The Defendant also waives the right to attack collaterally the guilty plea, conviction, and sentence.

8. The Defendant will forfeit to the United States all interest in the property listed in the forfeiture allegation of the Indictment and will execute any documents necessary for this forfeiture.

9. After pleading guilty, the Defendant will make a full and complete financial disclosure to the United States and will assist the United States in the gathering of all financial information. The Defendant will complete and sign a financial disclosure statement or affidavit, will sign financial releases prepared by the United States, and will submit to a deposition in aid of collection at times and places that the United States directs. The Defendant authorizes the United States to obtain the Defendant's credit reports. The Defendant agrees that any unpaid penalty will be submitted to the United States Treasury for offset. If the Defendant fails to comply with any of the provisions of this paragraph, the United States will not move the Court pursuant to U.S.S.G. § 3E1.1(b) to reduce the offense level by one additional level, and may in its discretion argue to the Court that the Defendant should not receive a two-level reduction for acceptance of responsibility pursuant to U.S.S.G. § 3E1.1(a).

10. If the Defendant violates any part of this Agreement, the United States may void this Agreement and seek an indictment for any violations of federal laws, and the Defendant waives any right to challenge the initiation of additional federal charges.

11. This document and the sealed supplement contain the complete and only Plea Agreement between the United States Attorney for the Eastern District of Kentucky and the Defendant. The United States has not made any other promises to the Defendant.

12. This Agreement does not bind the United States Attorney's Offices in other districts, or any other federal, state, or local prosecuting authorities.

13. The Defendant and the Defendant's attorney acknowledge that the Defendant understands this Agreement, that the Defendant's attorney has fully explained this Agreement to the Defendant, and that the Defendant's entry into this Agreement is voluntary.

KERRY B. HARVEY
UNITED STATES ATTORNEY

Date: 4/1/15    By: _____
Robert M. Duncan, Jr.
Assistant United States Attorney

Date: 4.1.15    _____
Alvin Jason Givens
Defendant

Date: 4-1-15    _____
William Daniel Carman
Attorney for Defendant

**APPROVED**, this _____ day of _____, _____.

_____
UNITED STATES DISTRICT JUDGE